**No. 15-7100**

# In the

# United States Court Of Appeals

## For the District of Columbia Circuit

Encyclopaedia Britannica, Inc.,

*Appellant,*

v.

Dickstein Shapiro, LLP,

*Appellee.*

Appeal From the United States
District Court for the District of Columbia

## BRIEF OF APPELLANT
Encyclopaedia Britannica, Inc.

Neil H. Koslowe (D.C. Bar No. 361792)
Potomac Law Group, PLLC
1300 Pennsylvania Avenue, N.W., Suite 700
Washington, DC 20004
Telephone: (202) 320-8907
Facsimile: (202) 318-7707

Dated: February 1, 2016

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Per Circuit Rule 28, Encyclopaedia Britannica states:

**Parties and Amici:** The only parties are Encyclopaedia Britannica, Inc. and Dickstein Shapiro Shapiro LLP. There are no amici or intervenors here or in the District Court.

Encyclopaedia Britannica's corporate disclosure statement as required by Circuit Rule 26.1 appears on the next page.

**Rulings Under Review:** There are two. The first is the order dismissing Encyclopaedia Britannica's amended complaint under Rule 12(c), the District Court's Memorandum Opinion dated August 26, 2015, the Honorable Royce C. Lamberth. The Opinion is document number 106 in the record from the District Court, and is reported at *Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP,* 2015 U.S. Dist. LEXIS 113792 (D.D.C. Aug. 27, 2015).

The second ruling is the order dismissing Encyclopaedia Britannica's claim for breach of fiduciary duty, the District Court's Memorandum Opinion dated February 2, 2012, the Honorable John D. Bates. The opinion is document number 36 in the record.

**Related Cases:** There are no related cases.

ii

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, Counsel for Appellant, Encyclopaedia Britannica, Inc., certifies the following:

1.     The full name of every party or amicus represented by us is:

Encyclopaedia Britannica, Inc.

2.     The names of the real parties in interest (if the party named in the caption is not the real party in interest) represented by us is:

Encyclopaedia Britannica, Inc.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by us are:

Encyclopaedia Britannica Holding, S.A.

4.     The names of all law firms and the partners or associates who appeared for the party or amicus now represented by me in the trial court or agency or who are expected to appear in this Court are:

Neil H. Koslowe (D.C. Bar No. 361792)
Potomac Law Group, PLLC
1300 Pennsylvania Avenue, N.W., Suite 700
Washington, DC 20004
Telephone: (202) 320-8907
Facsimile: (202) 318-7707

Robert P. Cummins
NORMAN, HANSON & DETROY, LLC
Two Canal Plaza
Portland, ME 04112
Telephone: (207) 553-4712

iii

Raymond P. Niro
Joseph N. Hosteny
Frederick C. Laney
NIRO, HALLER & NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois 60602
Telephone: (312) 236-0733

Joseph E. DiGenova
Victoria Toensing
DIGENOVA & TOENSING, LLP
1776 K Street, NW
Suite 737
Washington, DC 20006
Telephone: (202) 289-7701

Dated: February 1, 2016          */s/ Neil H. Koslowe*
                                 *Attorney for Appellant,*
                                 Encyclopaedia Britannica, Inc.

iv

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS
    AND RELATED CASES ............................................................... ii

CORPORATE DISCLOSURE STATEMENT ..................................... iii

I.    STATEMENT OF JURISDICTION ................................................. 1

II.   STATEMENT OF THE ISSUES ..................................................... 1

III.  STATUTES AND REGULATIONS ................................................ 2

IV.   CONCISE STATEMENT OF THE CASE ....................................... 2

V.    SUMMARY OF THE ARGUMENT ............................................... 4

      A.   The Essential Background ...................................................... 4

      B.   Dickstein Shapiro Throws the Encyclopaedia Britannica
           Patents Under the Bus ........................................................... 6

VI.   ARGUMENT ............................................................................... 9

      A.   Standard of Review ................................................................ 9

      B.   Dickstein Shapiro Repeatedly Praised the Inventions as
           Worthy of Patent Prosecution ............................................... 9

      C.   The Citation of *Alice* Is Misplaced – Liability Arose at the
           Time Of Encyclopaedia Britannica's Injury ......................... 12

      D.   Dickstein Shapiro's Conduct Impeaches the *Alice* Theory ... 15

      E.   The Court Incorrectly Adopted Dickstein Shapiro's After-
           the-Fact Analysis ................................................................. 18

      F.   The Court Erred In Holding That The Patents Did Not
           Comply With §101 ................................................................ 20

VII.   THE DISTRICT COURT COMMITTED REVERSIBLE
       ERROR BY DISMISSING ENCYCLOPAEDIA
       BRITANNICA'S BREACH OF FIDUCIARY DUTY CLAIM...................31

       A.   The Legal Standard ................................................................32

       B.   Encyclopaedia Britannica Alleged Sufficient Facts for a
            Breach of Fiduciary Duty Claim ........................................35

VIII.  CONCLUSION AND STATEMENT OF RELIEF SOUGHT....................40

CERTIFICATE OF COMPLIANCE......................................................42

PROOF OF SERVICE..........................................................................43

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.O. Smith Corporation v. Lewis, Overbeck & Furman*,
  979 F.2d 546 (7th Cir. 1992) ...............................................................14

*Abdelfattah v. U.S. Dep't of Homeland Sec.*,
  787 F.3d 524 (D.C. Cir. 2015)........................................................32, 33, 36, 37

*Alice Corp. v. CLS Bank Int'l.*,
  134 S. Ct. 2347 (2014)........................................................ 1, *passim*

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................37

*Atherton v. D.C. Office of Mayor*,
  567 F.3d 672 (D.C. Cir. 2009)..........................................................32

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................33, 36, 37, 38

*Bilski v. Kappos*,
  561 U.S. 593, 130 S. Ct. 3218 (2010)...............................................21

*Biomet, Inc. v. Finnegan Henderson, LLP*,
  967 A.2d 662 (D.C. 2009) ..........................................................13, 14

*Bolton v. Crowley, Hoge & Fein, P.C.*,
  110 A.3d 575 (D.C. 2015) ...................................................34, 35, 40

*Burke v. Air Serv Int'l, Inc.*,
  685 F.3d 1102 (D.C. Cir. 2012)........................................................33

*buySAFE, Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014) ........................................................22

*Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*,
  59 F. Supp. 3d 974, 995 (C.D. Cal. 2014) ........................................28

*Communique Lab., Inc. v. Citrix Sys., Inc.*,
    No. 1:06-cv-253, 2015 WL 9268913 (N.D. Ohio Dec. 21, 2015).....................29

*Council of Am.-Islamic Relations Action Network, Inc. v. Gaubatz*,
    82 F. Supp.3d 344, 353 (D.D.C. 2015)..................................................34

*Data Distrib. Techs., LLC v. BRER Affiliates, Inc.*,
    No. 12–4878, 2014 WL 4162765 (D.N.J. Aug. 19, 2014) .................................21

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014) .............................................................21, 29, 30

*Encyclopaedia Britannica, Inc. v. Dickstein Shapiro, LLP*,
    905 F. Supp. 2d 150 (D.C.D.C. 2012) ....................................................40

*Every Penny Counts, Inc. v. Wells Fargo Bank, N.A.*,
    No. 8:11-cv-2826-T-23TBM, 2014 WL 4540319 (M.D. Fla. Sept.
    11, 2014) .........................................................................................22

*Fox v. Gov't of the D.C.*,
    794 F.3d 25 (D.C. Cir. 2015)..................................................................9

*Griva v. Davison*,
    637 A.2d 830 (D.C. 1994) .....................................................35, 36, 39

*Helios Software, LLC v. SpectorSoft Corp.*,
    No. 12-081-LPS, 2014 WL 4796111 (D. Del. Sept. 18, 2014).........................21

*Hendry v. Pelland*,
    73 F.3d 397 (D.C. Cir. 1996) ............................................. 34, 35, 36, 38, 39, 40

*Jones v. Lattimer*,
    No. CV 12-2050 (BAH), 2014 WL 869470 (D.D.C. Mar. 6, 2014) .................13

*Mills v. Cooter*,
    647 A.2d 1118 (D.C. 1994) ....................................................................38

*PNC Bank, N.A. v. Secure Axcess, LLC*,
    No. CBM2014-00100, 2014 WL 4537440 (P.T.A.B. Sept. 9, 2014)................22

*Vicki Bagley Realty, Inc. v. Laufer*,
    482 A.2d 359 (D.C. 1984) ....................................................................34

**Statutes**

28 U.S.C. § 1291 ..................................................................1

28 U.S.C. § 1332 ................................................................34

28 U.S.C. § 1332(a)(1) ........................................................1

Title 35, United States Code, § 101 ..................................1, 7, 8, 20, 31

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ..................................................32, 33

The Law Governing Lawyers § 20, cmt. c (2000) ................................38

Rule 1.4 ..............................................................36, 38, 39, 40

Rule 1.7 ..............................................................................5

Rule 12(c) ........................................................................20

Rule 15(c) ..........................................................................3

## I.   STATEMENT OF JURISDICTION

This is an appeal from a final judgment of the District Court for the District of Columbia. Jurisdiction exists pursuant to 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 1291.

## II.   STATEMENT OF THE ISSUES

The issues are:

1.      Whether the District Court committed error by applying the 2014 *Alice* ruling to a proximate cause determination rather than the law prevailing at the time of Dickstein Shapiro's malpractice?

2.      Assuming *Alice Corp. v. CLS Bank Int'l.,* 134 S. Ct. 2347 (2014) applies, whether the District Court committed error in concluding that the Encyclopaedia Britannica patents obtained by Dickstein Shapiro were invalid *ab initio* because the inventions for which Dickstein Shapiro spent years in seeking protection were "abstract ideas" and simply never patentable?

3.      Whether the District Court committed error in granting judgment on the pleadings in light of compelling evidence of Dickstein Shapiro's malpractice?

4.      Whether the District Court committed error in dismissing Encyclopaedia Britannica's breach of fiduciary duty claim?

1

## III.    STATUTES AND REGULATIONS

Title 35, United States Code, § 101 states:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

## IV.    CONCISE STATEMENT OF THE CASE

This is an action for malpractice against the Dickstein Shapiro law firm. Dickstein Shapiro had represented Encyclopaedia Britannica in patent matters beginning in the 1980's and virtually continuously thereafter until Dickstein Shapiro's malpractice was revealed. In sum, this suit is based on Dickstein Shapiro's negligence in connection with the pursuit of two of Encyclopaedia Britannica's most valuable patents, i.e. United States Patents Nos. 7,051,018 and 7,082,437.

In 2007 (with the benefit of and in reliance on Dickstein Shapiro's advice and counsel) Encyclopaedia Britannica sued Alpine Electronics of America, Inc. and other defendants in the Texas Federal District Court for infringing Encyclopaedia Britannica's valuable '018 and '437 patents. Following suit, Alpine and the other defendants moved for summary judgment. The Court granted judgment and found the patents to be invalid. (Doc. No. 74-1, Exhibit A). As set forth in Encyclopaedia Britannica's complaint, this finding of invalidity was the direct and proximate result of Dickstein Shapiro's malpractice. The essence of the

2

Court's ruling was that an earlier Encyclopaedia Britannica publication was "prior art" sufficient to invalidate the patents in suit. But for Dickstein Shapiro's negligence, that so-called "prior art" would not have been of any significance.

More particularly, the '018 and '437 patent applications were filed based on a "priority date" claim of 1989 through a chain of patent applications. Not unlike filing a series of amended pleadings under Rule 15(c) that "relate back" and have the benefit of an original complaint (and, thus avoid a statute of limitations defense), a series of patent applications can be based on an original application and thus have the benefit (i.e. claim the "priority") of that original patent filing. This continuity is critical in the patent context so that intervening acts, events or publications do not threaten the validity of those patents that emanate at the end of the chain.

In order to sustain that priority date, certain specific statutory and patent office requirements have to be satisfied. Satisfaction of these requirements is routine for members of the patent bar. Indeed, the Dickstein Shapiro patent lawyers routinely complied with those mandates when dealing with other Encyclopaedia Britannica patent properties, but not so in the case of the '018 and '437 patents. As we allege in the amended complaint (Doc. No. 74), Dickstein Shapiro's malpractice and belated filings leading to the '018 and '437 applications broke the priority chain and, thus exposed those patents to the invalidating defense affirmed

by the District Court in Texas. It is these failures and Dickstein Shapiro's breaches

of fiduciary duty for which we seek recovery.

## V.    SUMMARY OF THE ARGUMENT

### A.    The Essential Background

The District Court committed manifest error in granting judgment on the

pleadings without the benefit of discovery and expert testimony. To do so, the

court had to find that recent "developments in patent law"—the *Alice* decision in

2014—would make it impossible for Encyclopaedia Britannica to prove Dickstein

Shapiro's liability for admitted negligence that took place many years prior to

those "developments." The Court did so in the context of our pending request to

conduct discovery after proceedings languished in the case awaiting rulings on

several pending motions. Most critically, the Court ignored indisputable record

evidence of decades of Dickstein Shapiro's conduct and advice that flatly

contradicted Dickstein Shapiro's hypocritical thesis that the services they rendered

for Encyclopaedia Britannica over many years and at great expense to

Encyclopaedia Britannica were actually worthless.

Under the mandates of the Code of Professional Responsibility adopted by

this Court (and beyond the inherent and fundamental duty of honesty), Dickstein

Shapiro owed Encyclopaedia Britannica the duties of diligence, competence,

candor and conflict free representation, among other obligations.

The record before this Court demonstrates that Dickstein Shapiro has intentionally and repeatedly violated those rules and breached its duties to Encyclopaedia Britannica from the moment Dickstein Shapiro's negligence and malpractice were revealed in the Texas lawsuit. Those breaches and Dickstein Shapiro's self-serving repudiation of the advice it rendered to Encyclopaedia Britannica are critical to understanding how the District Court was misled into committing the manifest errors being challenged before this Court.

As noted above, Dickstein Shapiro's representation of Encyclopaedia Britannica before the United States Patent Office led to Encyclopaedia Britannica being awarded the '018 and' 437 patents that were asserted in the Texas litigation. Until that litigation exposed Dickstein Shapiro's malpractice, Dickstein Shapiro repeatedly assured Encyclopaedia Britannica that the '018 and '437 patents were valid and infringed. When the adverse ruling was laid down by the Texas Court in 2007, Dickstein Shapiro told Encyclopaedia Britannica that the adverse ruling was error and that Dickstein Shapiro could remedy the problem. By ignoring the conflict it then faced in violation of Rule 1.7, Dickstein Shapiro pursued a self-serving course of action by trying to cover up and fix Dickstein Shapiro's earlier (undisclosed but admitted) errors and incompetence. In doing so, Dickstein Shapiro submitted an affidavit of Dickstein Shapiro partner Jon D. Grossman which essentially confessed negligence on the part of Dickstein Shapiro and

doomed any possibility of salvaging the '018 and '437 patents. (Doc. No. 74-4, Exhibit D).

But more critical to this appeal is what took place in 2007 when Dickstein Shapiro incompetently attempted to save the Encyclopaedia Britannica patents and how Dickstein Shapiro's breaches of fiduciary duty have led the District Court to commit manifest error in these proceedings -- the why (i.e. to avoid malpractice liability) is obvious.

### B.    Dickstein Shapiro Throws the Encyclopaedia Britannica Patents Under the Bus

In the Texas case, one of the defenses raised against the Encyclopaedia Britannica patents was the assertion that the Encyclopaedia Britannica patents were not infringed (i.e. the patents were of limited scope and did not cover GPS devices). In 2007, during that Texas litigation and as Dickstein Shapiro continued to try to fix the malpractice, Dickstein Shapiro repeatedly assured Encyclopaedia Britannica that such a contention was nonsense. As the record demonstrates, Dickstein Shapiro had specifically prepared the patents to cover such accused GPS products. (Declaration of William J. Bowe, Doc. No. 79-5 ¶¶ 7-10; Affidavit of Brian W. Oaks, Doc. No. 79-6 ¶¶ 2-8).

The undisputed fact is that Encyclopaedia Britannica would not have undertaken the Texas litigation in 2007 if its lawyers at Dickstein Shapiro had even suggested that the patents were not infringed. (Bowe Declaration, Doc. No. 79-5 ¶¶

6

12-13). Encyclopaedia Britannica specifically relied on that advice in bringing suit and in rejecting low-ball offers to settle. Lawyers at the Baker Botts firm—who worked with Dickstein Shapiro in 2007—have confirmed this fact and have confirmed that Dickstein Shapiro drafted the patents to specifically cover GPS and similar devices. (Oaks Affidavit, Doc. No. 79-6 ¶¶ 2-8).

Of course, now and after being sued, Dickstein Shapiro has repudiated those years of well-paid advice and, in motion practice before the District Court in this case, has disingenuously sought to have the Encyclopaedia Britannica patents determined to be limited in scope in direct contradiction of the advice Encyclopaedia Britannica relied on to Encyclopaedia Britannica's great detriment. (Doc. No. 74). We contend that Dickstein Shapiro should be barred from taking such a position and will so prove at trial.

More directly critical to this appeal is Dickstein Shapiro's after-the-fact recourse to an inapplicable and misplaced defense based on *Alice Corp. v. CLS Bank Int'l.,* 134 S.Ct. 2347 (2014). In 2007, the defendants in the Texas case also asserted that Encyclopaedia Britannica's patents did not comply with the patent statute. For Dickstein Shapiro, such a boilerplate defense was nothing new and it was not given a wink or a nod. Indeed and for at least two decades, Dickstein Shapiro had fought such contentions and taken steps to insure that Encyclopaedia Britannica's patents were in full compliance with 35 U.S. Code §101. Is this Court

7

to believe that Dickstein Shapiro would have pursued remediation of Grossman's malpractice following the Texas ruling in 2007 if the patents were of no value and non-compliant with §101?

As we set forth below, the *Alice* defense is not meritorious and Dickstein Shapiro misled the District Court to get it wrong. But beyond that, we ask this Court to consider the following: Is it fair and equitable for a law firm to reap millions in fees in pursuing the acquisition of assets on the client's behalf; convince the client that the assets are worth millions (and more than justify the millions in fees the lawyers were paid); undertake to exploit the assets and then, when sued for admitted malpractice, to reverse position to avoid liability by asserting the assets in question were valueless *ab initio*?

Quite simply, the Dickstein Shapiro lawyers representing Encyclopaedia Britannica breached fundamental fiduciary duties by asserting the groundless *Alice* and scope defenses that attempt to repudiate the advice Dickstein Shapiro repeatedly affirmed to Encyclopaedia Britannica over many years and on which Dickstein Shapiro intended Encyclopaedia Britannica to rely at least until they got sued.

8

## VI.   ARGUMENT

### A.   Standard of Review

A District Court's grant of a motion for judgment on the pleadings is reviewed de novo, taking the allegations of the complaint as true. *Fox v. Gov't of the D.C.,* 794 F.3d 25, 29 (D.C. Cir. 2015). Applying that standard here makes clear that the District Court was wrong in concluding Encyclopaedia Britannica could not prevail in proving the case within the case.

### B.   Dickstein Shapiro Repeatedly Praised the Inventions as Worthy of Patent Prosecution

As Dickstein Shapiro has asserted for more than a decade (and before it was sued), the '018 and '437 patents it obtained for Encyclopaedia Britannica disclose and claim a unique search mechanism and architectural system for accessing and searching multiple types of electronic information. The system combination of multiple, independent search paths, coupled with reciprocal links to multiple informational databases that can be easily navigated is not an "abstract idea." Humans simply cannot achieve what the Encyclopaedia Britannica's inventions allow one to accomplish. This "ingenious" system is not a case (as in *Alice*) of simply adding a computer to otherwise conventional steps. Indeed, "otherwise conventional steps" cannot accomplish what the system of the '018 and '437 patents can achieve.

9

In Dickstein Shapiro's brief before the District Court more than a decade ago, Dickstein Shapiro argued that the Encyclopaedia Britannica inventions comprise:

> a user-friendly computerized multimedia search system, the foundation of which consists of multiple independent and separate entry paths into the database and interrelated textual and graphical information. Multiple independent entry paths allow the user access to the database by searching either graphically or textually without any one entry path constraining or controlling another. Interrelated data links provide direct access from textual information to related graphical information and back from the same graphical information to the same textual information. Thus, whichever way the user finds textual or graphical information, reciprocal links provide an indication of and direct access to interrelated information of the other kind.

(Plaintiff's Pre-Hearing Brief, Doc. No. 78-17 at 7).

As an example of but one feature of the Encyclopaedia Britannica inventions, think of a routine hotel experience before there were connecting rooms. The hallway in the hotel leads to rooms marked "textual information" and rooms marked "graphical information." If a hotel guest entered the "textual information room", he could not enter the "graphical information" room without returning to the hallway. In the hotel of the Encyclopaedia Britannica inventions, those rooms are interconnected and optional travel between the rooms is not constrained. Our duty of candor requires us to note that we lifted this example from Dickstein Shapiro's 2009 brief wherein they also quoted from PC Magazine. The magazine discussed the success in 1989 of the Compton's Multimedia Encyclopedia. The

10

Compton Encyclopedia represents Encyclopaedia Britannica's invention because the Compton Encyclopedia was marked with the '671 patent, the parent to the '437 and '018 patents as follows:

> Compton's Multimedia Encyclopedia is the **first** successful implementation of a product that combine **words, pictures, and sound with an easy-to-use search engine. the product is incredibly adaptive to user's needs ....You can't help but be impressed by Britannica's courage and foresight in launching this product.**

(Doc. No. 78-17 at 5, emphasis added).

Disdaining any semblance of fiduciary duty and candor, Dickstein Shapiro willfully misled the District Court by mischaracterizing the inventions of the '018 and '437 patents. Before it was sued and faced liability, Dickstein Shapiro accurately and repeatedly told governmental officials in the Patent Office and its client Encyclopaedia Britannica a totally different and honest story. Thus, Dickstein Shapiro told the USPTO and Encyclopaedia Britannica that the inventions of the'018 and '437 patents were "ingenious." The pre-suit Dickstein Shapiro repeatedly declared that the inventions disclosed in the '018 and '437 patents constituted a break-through:

> "--for the first time *a system* that makes multimedia information readily accessible through a variety of user friendly controls. *The system* provides full search and retrieval of both graphical and textual information …. *[t]he invention's ingenious combination of graphical and textual search and retrieval entry paths enhances the usability of the medium by maximizing the capabilities provided by increased storage capacity of database storage mediums such as CD-ROMs to*

11

*produce a distinctive search and retrieval system unknown prior to
the disclosure in the ['437 and '018] patents*."

(November 15, 1999 Appeal Brief, Doc. 78-13 at 6-7) (emphasis

added).

Beyond these repeated accolades, the pre-suit Dickstein Shapiro proclaimed

that the inventive concept underlying the inventions of the '018 and '437 patents

was previously "unimaginable" like most breakthrough inventions. (Pre-Hearing

Brief, Doc. 78-17 at 3). Thus, Dickstein Shapiro consistently (and correctly)

described Encyclopaedia Britannica's inventions as comprising a tangible object –

i.e., a *search system* – that had new, "ingenious," "break-through," capabilities and

functionalities that could not be found in any prior system. In addition, Dickstein

Shapiro made clear that these "ingenious," "break-through inventions" were

important and substantive technological advances, not mere ideas or concepts.

### C.    The Citation of *Alice* Is Misplaced – Liability Arose at the Time Of Encyclopaedia Britannica's Injury

The standard of care by which Dickstein Shapiro's conduct must be judged

and the proximate cause determination that must be made in this case is controlled

by the law that applied in 2007-2009. The 2014 "developments in patent law"

represented by *Alice* constituted a sea change in the patentability of computer

software. Indeed, for determining malpractice liability, an attorney's conduct is to

be viewed in the context of events prevailing at the time of the alleged malpractice,

12

not in light of subsequent developments. *Biomet, Inc. v. Finnegan Henderson, LLP,* 967 A.2d 662, 668 (D.C. 2009). Pursuant to D.C. law, a plaintiff suffers "injury" in the context of legal malpractice when he suffers a "loss or impairment of a right, remedy, or interest." *Jones v. Lattimer*, No. CV 12-2050 (BAH), 2014 WL 869470 (D.D.C. Mar. 6, 2014) (Citing *Hunt v. Bittman*, 482 F. Supp. 1017, 1020 (D.D.C. 1980) *aff'd*, 652 F.2d 196 (D.C. Cir. 1981) ("In determining when a legal malpractice claim "accrues," the District of Columbia follows the so-called "injury" rule. Under this rule, a claim for legal malpractice accrues when the plaintiff-client suffers actual injury.")).

Here, the loss or impairment of Encyclopaedia Britannica's rights occurred no later than 2009, five years *before* the Supreme Court's decision in *Alice*. That is the relevant law that should be applied to the case-within-the-case analysis here, not *Alice*. Perhaps the clearest articulation of this bedrock principle is found in the Seventh Circuit's *A.O. Smith Corp.* opinion as follows:

> Dismissal of the tort action was not appropriate here. ***The opinion below undertakes an exhaustive but unnecessary tour through recent antitrust case law in the Supreme Court and in this Circuit. The District Court decision, dwelling as it does on a number of cases decided after the 1985 trial, assumes that the relevant question is whether proof of tied market power is required now, not whether it was required at the time of trial.*** This view cannot be correct. Both Illinois law governing legal malpractice actions and common sense suggest that an attorney's performance at trial must be evaluated by the state of the jurisprudence at the time of trial.... After all, it would be manifestly unfair to expect lawyers in the midst of trial to predict how the circuit courts and the Supreme Court will shape

13

new legal doctrine. The District Court relied on certain decisions subsequent to the 1985 trial because they were decided "closely on the heels of the antitrust trial" and these precedents might have been taken into account on appeal. The logic behind this reasoning is elusive. Though it might in some sense be easier to predict the near future than the distant future, ***it is nevertheless quite unrealistic to judge lawyers in a malpractice action by decisions that have not yet been handed down.***

*A.O. Smith Corporation v. Lewis, Overbeck & Furman*, 979 F.2d 546, 549 (7th Cir. 1992) (emphasis added).

In like manner, the District of Columbia Court of Appeals has held that it is the state of the law at the time of the lawyer's action or inaction that controls and not subsequent legal developments. *Biomet, Inc.*, 967 A.2d at 668 ("Whether [Defendant's] strategy of challenging only liability in the initial appeal was reasonable requires consideration of the state of the law regarding constitutional challenges to excessive punitive damages at the time of the appeal."). Here, Dickstein Shapiro's malpractice must be decided on the law at the time of the malpractice, not based on recent developments in the law.

Dickstein Shapiro cannot escape liability by relying on recent developments in the law reflected by the *Alice* decision. Indeed, if one were to accept this additional hindsight excuse by Dickstein Shapiro, it would have to be the case that Dickstein Shapiro repeatedly deceived its client and breached its fiduciary duties by: (1) pursuing the '018 and '437 patents in the first place; (2) asserting to the USPTO that these patents were "unquestionably infringed"; (3) advising

14

Encyclopaedia Britannica that it would prevail in the Texas litigation and then (4)

seeking to remediate Dickstein Shapiro's malpractice by pursuing corrective

measures before the USPTO following the filing of the summary judgment motion

in the Texas litigation. Such a position is simply untenable and is directly

contradicted by Dickstein Shapiro's actions. Dickstein Shapiro is entitled to its

own opinion of the history of the relationship, but it is not entitled to re-write

history. Accordingly, Dickstein Shapiro's malpractice must be viewed through the

lens of the law that existed at the time of the summary judgment decision in the

Texas litigation, not five years later using the after-developed *Alice* decision. The

District Court's ruling should be reversed for this reason alone.

### D.     Dickstein Shapiro's Conduct Impeaches the *Alice* Theory

If the **2014** ruling in *Alice* applied to the inventions of the '018 and '437

patents because, as Dickstein Shapiro now argues, "the law has not changed since

1952", then why the litany of contradictory facts and circumstances that flatly

impeach this thesis and which were ignored by the District Court.

Consider:

1.     When Dickstein Shapiro was retained by Encyclopaedia Britannica in

**<u>1989</u>**, why didn't Dickstein Shapiro advise Encyclopaedia Britannica that

Encyclopaedia Britannica's "ingenious" Multimedia Search System could not be

patented? If Encyclopaedia Britannica's Multimedia Search System was not

15

"patent eligible", did not Dickstein Shapiro's duty of candor mandate such a disclosure to Encyclopaedia Britannica?

2.      Why didn't Dickstein Shapiro advise Encyclopaedia Britannica in **1989** that it would be a waste of time, money and resources to file patent applications covering Encyclopaedia Britannica's "ingenious" Multimedia Search System. If Encyclopaedia Britannica's Multimedia Search System was not "patent eligible", did not Dickstein Shapiro's duty of candor mandate such a disclosure to Encyclopaedia Britannica?

3.      Why didn't Dickstein Shapiro advise Encyclopaedia Britannica in **1991** that it would be a waste of time, money and resources to file foreign patent applications covering Encyclopaedia Britannica's "ingenious" Multimedia Search System. If Encyclopaedia Britannica's Multimedia Search System was not "patent eligible", did not Dickstein Shapiro's duty of candor mandate such a disclosure to Encyclopaedia Britannica?

4.      Why didn't Dickstein Shapiro advise Encyclopaedia Britannica in **1993** that it would be a waste of time, money and resources to file the continuation patent applications covering Encyclopaedia Britannica's "ingenious" Multimedia Search System and leading to the '018 and '437 patents. If Encyclopaedia Britannica's Multimedia Search System was not "patent eligible," did not

16

Dickstein Shapiro's duty of candor mandate such a disclosure to Encyclopaedia Britannica?

     5.    Why didn't Dickstein Shapiro advise Encyclopaedia Britannica during the **1994 – 1997** time frame that all of the costly prosecution activity that was being pursued (and when Dickstein Shapiro was admittedly negligent) that it would be a waste of time, money and resources to file patent applications covering Encyclopaedia Britannica's "ingenious" Multimedia Search System? If Encyclopaedia Britannica's Multimedia Search System was not "patent eligible", did not Dickstein Shapiro's duty of candor mandate such a disclosure to Encyclopaedia Britannica?

     6.    Why didn't Dickstein Shapiro advise Encyclopaedia Britannica during the **1997 – 2006** time frame that issuance of the '018 and '437 patents was meaningless and that these patents were invalid? If Encyclopaedia Britannica's '018 and '437 patents were invalid, did not Dickstein Shapiro's duty of candor mandate such a disclosure to Encyclopaedia Britannica?

     7.    Why didn't Dickstein Shapiro advise Encyclopaedia Britannica in **2007** that it would be pure folly to bring suit based on the '018 and '437 patents? If Encyclopaedia Britannica's Multimedia Search System was not "patent eligible," did not Dickstein Shapiro's duty of candor mandate such a disclosure to Encyclopaedia Britannica?

17

8.    When notifying the malpractice insurance carrier in **2007** , why didn't Dickstein Shapiro simply say: "no harm, no foul -- the patents we admittedly bollixed were of "no value"?

9.    When sued for malpractice in **2010** and thereafter, why did Dickstein Shapiro file motion after motion before the District Court without a peep about "patent eligibility?" According to Dickstein Shapiro the law that they contend was controlling (and which they led Judge Lamberth to apply) had not changed since 1952.

This history is summarized in a chronology identifying significant events between 1989 and 2010. (Chronology, Doc. No. 18-2).

## E.    The Court Incorrectly Adopted Dickstein Shapiro's After-the-Fact Analysis

Nothing in Dickstein Shapiro's previous submissions supports its self-serving argument that Encyclopaedia Britannica's inventions are directed to nothing more than an abstract idea. To the contrary and before being sued, Dickstein Shapiro long proclaimed to Encyclopaedia Britannica, the Patent Office and others that the '018 and '437 are directed to a new and improved computerized search system (i.e., improving the functioning of the computer itself) to enhance a computer's ability to take advantage of the technological advancements occurring in data storage technology.

18

The District Court's opinion at pages 12-20 demonstrates that the District
Court bought into Dickstein Shapiro's mischaracterization of the subject matter of
the '018 and '437 patents. (Doc. No. 106). In adopting Dickstein Shapiro's
description of the patents, (often essentially verbatim), the Court began with the
manifestly incorrect premise that the Encyclopaedia Britannica patents "merely
claim computer implementation of an abstract idea using routine and conventional
computer components and processes." This is dead wrong.

Before being sued, Dickstein Shapiro said:

- This invention relates to a computer search system for
  retrieving textual and graphical information through multiple
  textual and graphical entry paths into a database. (Doc. No. 90-
  7, '437 patent, Column 1, lines 18 to 20).[1]

- In view of the foregoing, it should be apparent that a need still
  exists for a database search system that retrieves multimedia
  information in a flexible, user friendly system. It is, therefore, a
  primary object of the invention to provide a search system in
  which a multimedia database consisting of text, picture, audio
  and animated data is searched through multiple graphical and
  textual entry paths. (*Id.,* Column 2, lines 35 to 41).

- It is a further object of the invention to provide a search
  system wherein both the textual and graphical entry paths are
  interactive. (*Id.,* Column 2, lines 42 to 44).

- It is yet an additional object of the invention to provide for a
  search system where the textual and graphical entry paths are
  interrelated such that textual and graphical entry paths are

---

[1] The specification of the '018 and '437 patents is the same, so we quote only the
'437 patent.

interrelated such that textual information is fully  accessible from graphical entry paths and graphical information is fully accessible from textual entry paths. *(Id.,* Column 2, lines 45 to 49).

The Encyclopaedia Britannica inventions are not variations on activities performed by humans; there is no support in the record for this conclusion. Dickstein Shapiro's own previous representations to this Court and the USPTO in 1999 refute Dickstein Shapiro's misguided allegations. Dickstein Shapiro's appeal brief in the Patent Office said the inventions are "directed to an improvement of computer search and retrieval systems." (Appeal Brief, Doc. 78-13 at 5).

As noted elsewhere and prior to this lawsuit, Dickstein Shapiro correctly described and characterized the patents it obtained as a tangible object – i.e., a **search system** – that had new, "ingenious," "break-through," capabilities and functionalities that could not be found in any prior system. Dickstein Shapiro made clear that these "ingenious," "break-through inventions" were advances that involved a unique search and retrieval system -- one that enhanced a computer's ability to take advantage of the technological advancements occurring in data storage technology.

### F.     The Court Erred In Holding That The Patents Did Not Comply With §101

Even if *Alice* applies, the facts—which must be taken as true in resolving a Rule 12(c) motion—show that the '018 and '437 patents satisfy §101.

20

*Alice* precludes a patent on an abstract idea; in *Alice*, the idea was financial

risk management. 134 S.Ct. at 2352.  But "[d]efining 'abstractness' is difficult

because 'all inventions at some level embody, use, reflect, rest upon, or apply laws

of nature, natural phenomena, or abstract ideas.'" *Data Distrib. Techs., LLC v.*

*BRER Affiliates, Inc*., No. 12–4878 (JBS/KMW), 2014 WL 4162765, at *9 (D.N.J.

Aug. 19, 2014) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132

S. Ct. 1289, 1293 (2012)). A patent on an abstract idea "would pre-empt use of [a

particular] approach in all fields, and would effectively grant a monopoly over an

abstract idea." *Bilski v. Kappos*, 561 U.S. 593, 612, 130 S. Ct. 3218, 3231 (2010).

In *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir.

2014), the Federal Circuit grappled with the level of abstractness required by the

first step of the *Alice* test, as "the Supreme Court did not delimit the precise

contours of the abstract ideas category." *Id*. at 1256. The Federal Circuit observed:

> [O]ver the course of several cases the Court has provided some
> important principles. We know that mathematical algorithms,
> including those executed on a generic computer, are abstract ideas.
> *See Benson*, 409 U.S. at 64, 93 S.Ct. 253. We know that some
> fundamental economic and conventional business practices are also
> abstract ideas. *See Bilski*, 130 S.Ct. at 3231 (finding the "fundamental
> economic practice" of hedging to be patent ineligible); *Alice*, 134
> S.Ct. at 2356 (same for intermediated settlement).

*Id.*

A defendant's ability to summarize the subject matter of patent claims into a

pithy phrase is ***not*** determinative of whether the claims are drawn to an abstract

21

idea. Rather, courts require evidence that the "ideas are fundamental truths or fundamental principles the patenting of which would pre-empt the use of basic tools of scientific and technological work." *Helios Software, LLC v. SpectorSoft Corp.*, No. 12-081-LPS, 2014 WL 4796111, at *17 (D. Del. Sept. 18, 2014); *see also PNC Bank, N.A. v. Secure Axcess, LLC*, No. CBM2014-00100, 2014 WL 4537440, at *13 (P.T.A.B. Sept. 9, 2014) (refusing to hold that the claim at issue was patent-ineligible because the Petitioner failed to "provide sufficient persuasive evidentiary support that the [idea] is a fundamental economic practice" or a "building block of the modern economy") (internal quotations omitted).

Decisions finding patent claims to be directed to abstract ideas have supported these findings with evidentiary citations. *See, e.g., Alice Corp.,* 134 S. Ct. at 2356 (citing an 1896 article to show that intermediated settlement is "a fundamental economic practice long prevalent in our system of commerce"); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (citing a 1927 law review article on suretyship); *Every Penny Counts, Inc. v. Wells Fargo Bank, N.A.*, No. 8:11-cv-2826-T-23TBM, 2014 WL 4540319, at *1 (M.D. Fla. Sept. 11, 2014) (citing Blackstone's *Commentaries on the Laws of England* and an 1893 book).

The invention here is not an abstract idea. It is a new system to search a database. (Doc. No. 90-7, '437 patent, Column 2, lines 35 to 40). Searches, called

entry paths, can be based on text or graphical images including article titles (*Id.*, Column 4, lines 27 to 29), pictures (*Id.*, Column 4, lines 36 to 45), a world atlas (*Id.*, Column 4, lines 53 to 54), and a researcher assistant's program (*Id.*, Column 4, lines 63 to 64). The patent states:

> The textual and graphical entry paths are made up of eight separate and interrelated entry paths such that textual information is fully accessible from the graphical entry paths and graphical information is fully accessible from the textual entry paths.

(*Id.*, Column 4, lines 4 to 8).

Entry paths are interactive; use of one can lead to pertinent information in another path. (*Id.*, Column 2, lines 42 to 49). There are other paths, too: idea search, title finder, topic tree, and history timeline. (*Id.*, Column 6, lines 51 to 60). Each is discussed in detail in the patent.

The database includes audio and video sequences. (*Id.*, Column 6, lines 31 to 44). For example, if a user clicks on an underlined word in an article, the invention provides an audio pronunciation of the word. (*Id.*, Column 11, lines 41 to 50). The atlas can be searched by a place name, which displays a map of the place that can be viewed in different levels of detail. (*Id.*, Column 4, lines 55 to 62). The atlas can be rotated to locate a place of interest. (*Id.*, Column 4, lines 55 to 57). A user can click the place name, which automatically retrieves a related article. (*Id.*, Column 7, lines 27 to 32).

23

The invention keeps track of searches, and can flag materials that appear to be more relevant. (*Id*., Column 8, lines 45 to 48 and lines 56-64). It suggests alternate search terms, and can search using phrases, too. (*Id*., Column 9, lines 21 to 31 and Column 10, lines 15 to 25).

The text entry path is defined by an "Idea Search" which uses "stem indices." (*Id*., Column 4, lines 8 to 10 and Column 10, lines 52 to 53). A stem index is a root word with all related variations of that word. (*Id*., Column 4, lines 10 to 12 and Column 10, lines 55 to 60). "Friend" could be a root. Its variations would include "friendly," "friendship," "friendlier," and so on. The stem indices are concatenated by the Idea Search to link the stems to the same idea. (*Id*., Column 4, lines 13 to 17 and Column 10, lines 58 to 60). The collection of stems is a "Basic Receiving Unit." (*Id*., Column 10, lines 58 to 60). The stems are linked by using rules of grammar and a thesaurus. (*Id*., Column 4, lines 13 to 17). The material retrieved is ranked in order of relevance. *Id.*

The "Idea Search algorithm" is described in Figure 5, which is linked to Figures 3 and 4. (*Id*., Column 5, lines 19 to 24). A higher number of occurrences of a stem in the basic receiving unit is called a higher "exhaustivity" in the patent. (Id., Column 11, lines 6 to 8). Exhaustivity and other measures are used to rank articles in order of relevance to the idea reflected in the basic receiving units.

24

An article can be examined as shown in Figures 6 and 7. (*Id*., Column 5, lines 25 to 28). Terms can be clicked on and heard via audio. (*Id*., Figure 6, boxes 276, 278 and 280 and Figure 7, boxes 300 and 302). Video can be located and played. (*Id*., Figure 7, boxes 304, 306 and 308). Animations can be played. (*Id*., Figure 7, boxes 310, 311, 320, 322, 324 and 326).

Prior systems and methods lacked the versatility of the invention. The patent says:

> Despite the great potential for interactive CD-ROM systems, however, many of the current commercially available versions have important limitations in meeting this need. These limitations include products lacking entry paths into the CD-ROM database to retrieve graphical information, products that cannot flexibly search and retrieve different types of data formats, or products that will not allow the combination of search strategies to uncover graphical and related textual information or vice versa.

(*Id*., Column 1, lines 36 to 44).

Dickstein Shapiro told the Patent Office that the new system was "ingenious." Dickstein Shapiro appealed on Encyclopaedia Britannica's behalf from the Patent Office's final rejection of claims in a reexamination of the original parent patent to the patents in this case. Dickstein Shapiro praised the invention:

> The Reed patent discloses *for the first time a system* that makes multimedia information readily accessible  through a variety of user friendly controls.

> *The system* provides full search and retrieval of both graphical and textual information …. The invention's *ingenious combination of graphical and textual search and retrieval entry paths enhances the*

> ***usability of the medium by maximizing the capabilities provided
> by increased storage capacity of database storage mediums such
> as CD-ROMs to produce a distinctive search and retrieval system
> unknown prior to the disclosure in the Reed patent.***

(Doc. 78-13 at 6-7, emphasis added).[2]

In seeking the issuance of the Encyclopaedia Britannica, Dickstein Shapiro

proclaimed:

- This invention relates to a computer search system for retrieving textual and graphical information through multiple textual and graphical entry paths into a database. (Doc. No. 90-7, '437 patent, Column 1, lines 18 to 20).

- In view of the foregoing, it should be apparent that a need still exists for a database search system that retrieves multimedia information in a flexible, user friendly system. It is, therefore, a primary object of the invention to provide a search system in which a multimedia database consisting of text, picture, audio and animated data is searched through multiple graphical and textual entry paths. (*Id*., Column 2, lines 35 to 41).

- It is a further object of the invention to provide a search system wherein both the textual and graphical entry paths are interactive. (*Id*., Column 2, lines 42 to 44).

- It is yet an additional object of the invention to provide for a search system where the textual and graphical entry paths are interrelated such that textual and graphical entry paths are interrelated such that textual information is fully accessible from graphical entry paths and graphical information is fully accessible from textual entry paths. (*Id*., Column 2, lines 45 to 49).

---

[2] The Reed patent referred to is U.S. Patent No. 5,241,671 containing the same specification as the '437 and '018 patents. See field 63 on the first page of the '437 patent. Mr. Reed was the first-named inventor on all three patents.

This invention is not an abstract idea, or a law of nature, or a natural phenomenon. The invention is clearly not a mere mathematical formula, nor a fundamental economic practice, nor a method of organizing human activity. The Encyclopaedia Britannica inventions do not comprise merely a set of steps that can be performed by a human using paper and pencil. The invention is not something that "humans have also engaged in these activities for thousands of years." (Doc. No. 106 at 12). The District Court provided no support for the quoted remark. The system here is not merely doing something a human could do with an ordinary book, even one containing a series of articles, a compilation of pictures, a table of contents, and an index.

A reader of a book cannot cause the book to create stem indices, concatenate them into anything like basic receiving units, and then employ those units to analyze and to rank articles in order of relevance. A paper book index or table of contents is fixed and unchangeable. A reader of a book cannot rotate or zoom in on a picture of a map in a book. Maps in a paper book are fixed and unchangeable. A reader of a book cannot rotate an atlas, or click on a map and hear a pronunciation of a name of a city, or retrieve an article about that city by clicking the city name on the map. A reader of a book cannot cause the book to play an audio, or an animation, or a video.

27

Even prior art employing a computer, like the Grolier CD-ROM based encyclopedia, lacked the capabilities of the invention in the patents. The '437 patent describes the Grolier product. (Doc. No. 90-7, '437 patent, Column 1, lines 49 to 67 and Column 2, lines 1 to 9). The '437 patent concludes that "No facility exists for taking advantage of the CD-ROM's capacity to store pictures, sound, or video information." (*Id*., Column 2, lines 7 to 9). Nor is the invention in the '437 patent the mere use of a computer to implement something that was known. As Dickstein Shapiro wrote, the invention is an ingenious new *system*, not seen before.

As the Supreme Court stated, "an invention is not rendered ineligible for patent simply because it involves an abstract concept," but rather, "application[s] of such concepts to 'a new and useful end' . . . remain eligible for patent protection." *Alice Corp.,* 134 S. Ct. at 2354 (citations omitted). In determining whether such an inventive concept is embodied in the claims, the court is to "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim" into a patent-eligible application. *Id.* at 2354-55 (quotations and citations omitted). "The Court should not ask whether a human can [perform the claimed steps] using pencil and paper. Instead, the Court must ask whether "the [claim limitation] constitutes an inventive concept that sufficiently limits the

28

claim's preemptive effect." *Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 995 (C.D. Cal. 2014).

In *DDR Holdings*, the Federal Circuit addressed the subject matter eligibility of patents directed to systems and methods of generating a composite webpage that combined visual elements of a host website with the content of a third-party merchant. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014). "In particular, the . . . claims address[ed] the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after 'clicking' on an advertisement and activating a hyperlink." *Id.* at 1257. This problem was solved by creating a composite website that, upon activation of a hyperlink on a host website (such as an advertisement for a third-party merchant), would "display[ ] product information from the third-party merchant, but retain[ ] the host website's 'look and feel.'" *Id.* at 1248-49.

> Without concluding whether the claims were directed at an abstract idea, the Federal Circuit found that the claims were patent eligible because step two of the Alice/May framework was satisfied. *Id.* at 1259. The court in *DDR Holdings* reached that conclusion because, unlike other patents involving both the computer and the Internet which merely recited "the performance of some business practice known from a pre-Internet world along with the requirement to perform it on the Internet[,]" the claimed solution in *DDR Holdings* was "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* at 1257.

*Communique Lab., Inc. v. Citrix Sys., Inc.*, No. 1:06-cv-253, 2015 WL 9268913, at

\*11 (N.D. Ohio Dec. 21, 2015) (emphasis added). In other words, the key

difference between the claims at issue in *DDR Holdings* and those that the Federal

Circuit had previously invalidated under the *Alice* framework was that *DDR*

*Holdings* claims "d[id] not broadly and generically claim 'use of the Internet' to

perform an abstract business practice (with insignificant added activity)." *DDR*

*Holdings*, 773 F.3d at 1258. Rather, the claims specified ***how*** the Internet would be

manipulated in order to achieve the desired non-routine result and recited a

***particular*** method of addressing a specific problem faced by websites. *Id.* at 1258-

59.

The '437 patent does not merely add "computer" to a claim. Rather, it

describes in detail a new way of using a database. Figures 1 through 22 show flow

charts including the steps necessary to formulate the Idea Search (Doc. No. 90-7,

'437 patent, Figures 2, 3, 4 and 5), display articles (*Id.*, Figures 6 and 7), use Tools,

a Notebook, Research Paths and a Last Screen function (*Id.*, Figures 8, 9, 10, and

11), Title searches (*Id.*, Figure 13), a Topic Tree (*Id.*, Figure 14), a picture Explorer

(*Id.*, Figure 15), a History Timeline (*Id.*, Figures 16 and 17), an Atlas (*Id.*, Figures

18, 19 and 20), a Researcher's Assistant (Doc. No. 90-7, Figure 21) and Feature

Articles (Doc. No. 90-7, Figure 22).

30

No wonder PC Magazine—and Dickstein Shapiro—effusively praised the '018 and '437 patents. The patents gave the world a new tool for using and searching a database containing not only text, but also images, audio and video. They show how to locate and manipulate that data. They show how different kinds of data can be interrelated and connected.

The '437 patent is a very specific improvement to the general problem of efficiently searching a database that contains different data formats—text, pictures, audio, video, animations, and maps—using combinations of search techniques to identify related information, rank that information according to the user's wish, and allow movement to and from various types of data formats. The invention is not merely using a computer to accomplish a business or personal practice known before.

The '437 and '018 patents represent subject matter that is eligible for protection under § 101, and the District Court erred in holding that they did not.

## VII.  THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY DISMISSING ENCYCLOPAEDIA BRITANNICA'S BREACH OF FIDUCIARY DUTY CLAIM

In support of its breach of fiduciary duty claim,[3] Encyclopaedia Britannica alleged that (i) Dickstein Shapiro owed Encyclopaedia Britannica a fiduciary duty

---

[3] Encyclopaedia Britannica's breach of fiduciary duty claim was set forth in Count II of its original Complaint and, after the District Court dismissed that claim,

31

of loyalty, (ii) Dickstein Shapiro breached that duty by pursuing a self-serving course of action before the PTO which was designed to protect Dickstein Shapiro but which grievously injured Encyclopaedia Britannica, and that (iii) Dickstein Shapiro did this while notifying its insurance carrier – but not Encyclopaedia Britannica – that Dickstein Shapiro was in a position of conflict with Encyclopaedia Britannica, in violation of the D.C. Rules of Professional Conduct. Although the District Court acknowledged that Dickstein Shapiro acted before the PTO to protect its own interest, and that this interest differed from Encyclopaedia Britannica's interest, the District Court held that Encyclopaedia Britannica failed to allege sufficient facts to support a breach of fiduciary duty claim because it found "several flaws" in Encyclopaedia Britannica's line of reasoning and because it estimated that the damages Encyclopaedia Britannica could recover from its breach of fiduciary duty claim "would pale in comparison" to the damages it could recover from its malpractice claim. (Memorandum Opinion, February 2, 2012, Doc. No. 36 at 35. This was reversible error.

### A.    The Legal Standard

1. <u>Standard and Scope of Review</u>. This Court reviews *de novo* the grant of a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

---

Encyclopaedia Britannica re-alleged it in Count II of its Amended Complaint, Doc. 74, to preserve it for appeal.  Amended Complaint, Doc. No. 74  ¶¶ 12-17, 21-24.

*Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 533 (D.C. Cir. 2015).

When it conducts this review, the Court must '"treat the complaint's factual

allegations as true'" and "'must grant [the plaintiff] the benefit of all inferences

that can be derived from the facts alleged.'" *Id.*, quoting from *Atherton v. D.C.

Office of Mayor*, 567 F.3d 672, 677 (D.C. Cir. 2009). Because of "the assumption

that all the allegations in the complaint are true (even if doubtful in fact)," a

"complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The test every complaint must satisfy is plausibility. "'To survive a motion

to dismiss, a complaint must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'" *Abdelfattah*, 787 F.3d at 533,

quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl.*, 550 U.S. at

570. "'A claim has facial plausibility when plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged.'" *Id.*, quoting *Iqbal*, *id.*

Finally, "a well-pleaded complaint may proceed even if it appears 'that a

recovery is very remote and unlikely.'" *Bell Atl.,* 550 U.S. at 556, quoting *Scheuer

v. Rhodes*, 416 U.S. 232, 236 (1974). Indeed, "a well-pleaded complaint may

proceed even if it strikes a savvy judge that actual proof of those facts is

improbable." *Id.*

2. <u>Breach of fiduciary duty claim</u>. Under D.C. law, which controls in this diversity case (*Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1107 (D.C. Cir. 2012)),[4] a plaintiff claiming breach of fiduciary duty and seeking compensatory damages must allege the following: (i) the existence of a fiduciary duty, (ii) a breach of that duty, and (iii) injury proximately caused by the breach. *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 363-364 (D.C. 1984); *Council of Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 82 F. Supp.3d 344, 353 (D.D.C. 2015). A plaintiff claiming breach of fiduciary duty and seeking disgorgement of legal fees need not prove injury. *Hendry v. Pelland*, 73 F.3d 397, 403 (D.C. Cir. 1996) ("under District of Columbia law, clients suing their attorney for breach of the fiduciary duty of loyalty and seeking disgorgement of legal fees as their sole remedy need prove only that their attorney breached that duty, not that the breach caused them injury").

The D.C. Court of Appeals has recognized that, "'[t]he relation between attorney and client is a fiduciary relation of the very highest character, and binds the attorney to the most conscientious fidelity.'" *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 584 (D.C. 2015), quoting *David Welch Co. v. Erskine & Tulley*, 203 Cal. App. 3d 884, 890 (1988) (internal quotation marks and citation

---

[4] See Memorandum Opinion, Doc. 36 at 7 n. 5 (asserting diversity jurisdiction under 28 U.S.C. § 1332).

34

omitted). And this Court has noted that, "a basic fiduciary obligation of an attorney is the duty of 'undivided loyalty.'" *Hendry*, 73 F.3d at 401. Furthermore, both this Court and the D.C. Court of Appeals have held that "evidence that [an attorney] violated one of the rules of the District of Columbia Code of Professional Responsibility [is] sufficient to support [the clients'] claim that he violated his common law fiduciary duty." *Hendry, id.*; *Griva v. Davison*, 637 A.2d 830, 846-847 (D.C. 1994).

Finally, there is an important difference in the way injury is determined on a breach of fiduciary duty claim from the way it is determined on a negligence-based legal malpractice claim. "'[P]roof of success in the underlying case is an appropriate test for proximate cause in a negligence-based action because it ensures that attorneys are only held professionally liable where their failures to adhere to the standard of care actually impacted the plaintiff's interests in the case. But an attorney's breach of his fiduciary duties to his client may cause injury entirely separate from the merits of the underlying case.'" *Bolton*, 110 A.2d at 583, quoting [*Crist v. Loyacono*, 65 So. 2d 837, 843 (Miss. 2011)].

### B. Encyclopaedia Britannica Alleged Sufficient Facts for a Breach of Fiduciary Duty Claim

Encyclopaedia Britannica's factual allegations in support of its claim that Dickstein Shapiro breached its fiduciary duty of loyalty to Encyclopaedia Britannica were that: (i) "Dickstein Shapiro pursued a self-serving course of action

35

in the Patent Office (PTO) that would arguably seek to remedy Dickstein Shapiro's

earlier errors and incompetence" by submitting an affidavit "which essentially

confess[ed] negligence on the part of Encyclopaedia Britannica's counsel

Dickstein Shapiro" (Amended Complaint, Doc. 74 ¶¶ 12, 15); that, (ii) this action

grievously injured Encyclopaedia Britannica because it "doomed any possibility of

the PTO granting relief that would have salvaged the '019 and '437 patents" and

"further weakened … Encyclopaedia Britannica's position in the Summary

judgment proceedings before [the Texas District Court in the *Alpine* litigation]"

(*Id*. ¶¶ 13, 15); and that, (iii) Dickstein Shapiro engaged in this action while it

"alerted Dickstein Shapiro's insurer to the likelihood of a malpractice claim by

Encyclopaedia Britannica" but "without Dickstein Shapiro advising Encyclopaedia

Britannica that Dickstein Shapiro was in a conflicted posture in derogation of Rule

[1.4] of the Rules of Professional Conduct (*Id*. ¶¶ 12, 13). Given that Dickstein

Shapiro owed Encyclopaedia Britannica a fiduciary duty of undivided loyalty

(*Hendry*, 73 F.3d at 401); that the District Court was required to accept as true

Encyclopaedia Britannica's factual allegations that Dickstein Shapiro was disloyal

before the PTO and that Dickstein Shapiro's action grievously injured

Encyclopaedia Britannica (*Bell Atl.*, 550 U.S. at 555; *Abdelfattah*, 787 F.3d at

533); and that Encyclopaedia Britannica showed that Dickstein Shapiro violated

Rule 1.4 by withholding information from it to serve Dickstein Shapiro's own

interest, which alone "[is] sufficient to support [a client's] claim that [its attorney] violated [its] common law fiduciary duty" (*Hendry, id*.; *Griva*, 637 A.2d at 846-847), these allegations stated a claim for relief that was "plausible on its face" (*Iqbal*, 556 U.S. at 678; *Bell Atl.*, 550 U.S. at 570; *Abdelfattah*, 787 F.3d at 533).

The District Court, which held to the contrary, fell into error by disbelieving or disregarding some of these allegations, neither of which it is permitted to do on a motion to dismiss for failure to state a claim. For example, the District Court acknowledged that, "[a]s Britannica's counsel correctly articulated at the motions hearing," Dickstein Shapiro's and Encyclopaedia Britannica's positions before the PTO were at odds because Dickstein Shapiro was focused on avoiding a negligence claim while Encyclopaedia Britannica was focused on saving its patents. (Memorandum Opinion, Doc. No. 36 at 35). Yet, in the teeth of Encyclopaedia Britannica's factual allegations, the District Court characterized their interests as "parallel." *Id*. Similarly, ignoring Encyclopaedia Britannica's allegation that Dickstein Shapiro's self-serving conduct before the PTO "doomed" the possibility that the PTO would salvage its valuable patents, the District Court inexplicably concluded that "Britannica has failed to allege facts indicating that Dickstein Shapiro did anything that conflicted with its client's interests." *Id*. at 36

The District Court also erroneously injected a foreign factor into its analysis of the viability of Encyclopaedia Britannica's breach of fiduciary duty claim. The

37

District Court assumed that Encyclopaedia Britannica would be able to recover only the "costs of litigating *Alpine*" if it prevailed on its breach of fiduciary claim against Dickstein Shapiro, which would "pale in comparison to the lost profits from the invalid patents." (Memorandum Opinion, Doc. No. 36 at 35). However, if Encyclopaedia Britannica proved the facts supporting its breach of fiduciary duty claim, including the grievous injury it alleges that Dickstein Shapiro inflicted upon it, there is no reason to assume Encyclopaedia Britannica's damages would be limited to litigation costs and could not include full compensatory and punitive damages. *See Hendry*, 73 F.3d at 401-402; *Mills v. Cooter*, 647 A.2d 1118, 1123 (D.C. 1994). In any event, the magnitude of Encyclopaedia Britannica's potential damage recovery is not a factor even a "savvy" District Court is supposed to consider in adjudicating the plausibility of Encyclopaedia Britannica's breach of fiduciary duty claim. *Bell Atl.,* 550 U.S. at 556.

Finally, the District Court erroneously misapprehended and discounted the significance of Dickstein Shapiro's alleged violation of Rule 1.4 of the Rules of Professional Conduct. Although the District Court agreed with Encyclopaedia Britannica that Rule 1.4 and the Restatement (Third) of the Law Governing Lawyers § 20, cmt. c (2000) generally require a lawyer to inform his or her client about the possibility of a malpractice suit, the District Court concluded that, because Encyclopaedia Britannica was represented by other counsel at the time

38

Dickstein Shapiro withheld from Encyclopaedia Britannica the notice of a likely malpractice claim that it gave to its insurer, and because the defendants in the *Alpine* litigation had spelled out in their court submission the problems with the patent chain, Encyclopaedia Britannica was not harmed by Dickstein Shapiro's silence. (Memorandum Opinion, Doc. No. 36 at 37). However, as this Court and the D.C. Court of Appeals have held, proof that an attorney violated one of the rules of the District of Columbia Code of Professional Responsibility or Rules of Professional Conduct, standing alone, "[is] ***sufficient*** to support [the clients'] claim that he violated his common law fiduciary duty (emphasis added)." *Hendry,* 73 F.3d at 401. *Accord, Griva*, 637 A.2d at 846-847. Therefore, instead of dismissing Encyclopaedia Britannica's breach of fiduciary claim based on Dickstein Shapiro's alleged violation of Rule 1.4, the District Court should have allowed it to proceed to trial regardless of the harm it caused.

In addition, the significance of Dickstein Shapiro's alleged violation of Rule 1.4 was that it concealed from Encyclopaedia Britannica Dickstein Shapiro's admission that it was in a position of conflict with Encyclopaedia Britannica. Had Dickstein Shapiro timely revealed this information to Encyclopaedia Britannica, it would have been possible for Encyclopaedia Britannica to engage independent counsel to attempt other mediation efforts before the PTO to salvage Encyclopaedia Britannica's valuable patents.

39

Lastly, this Court and the D.C.Court of Appeals have held that a client may obtain disgorgement of legal fees if his or her attorney violated one of the Rules of Professional Conduct without having to prove injury. *Hendry*, 73 F.3d at 399; *Bolton*, 110 A.3d at 581-582. Therefore, Encyclopaedia Britannica could obtain relief on its claim that Dickstein Shapiro violated Rule 1.4 even if that violation did not cause Encyclopaedia Britannica harm.

In sum, Encyclopaedia Britannica alleged sufficient facts to support a cognizable breach of fiduciary duty claim, and the District Court committed reversible error in dismissing that claim.

## VIII.  CONCLUSION AND STATEMENT OF RELIEF SOUGHT

On one hand and given the liability Dickstein Shapiro faces, it is not difficult to understand the hypocritical extremes to which it has gone in seeking to rely on *Alice*. On the other hand, the backflip Dickstein Shapiro has undertaken (i.e. contending that the patents Dickstein Shapiro obtained after years of effort and at great cost to its client Encyclopaedia Britannica were worthless from the get-go) is a manifest breach of fiduciary duty. Bottom line: Dickstein Shapiro knows that a finding of liability awaits the firm given the clear record of Dickstein Shapiro's malpractice. Although the District Court rejected our motion seeking to estop Dickstein Shapiro, the Court did note that Grossman's admissions will carry "particular weight as evidence at least that some claims were infringed."

40

*Encyclopaedia Britannica, Inc. v. Dickstein Shapiro, LLP,* 905 F. Supp. 2d 150, 156 (D.D.C. 2012). In a similar vein and when Dickstein Shapiro's conflicted efforts to remediate were rejected by the USPTO in 2008, the following message was sent regarding Dickstein Shapiro's negligence:

> Circumstances resulting from petitioners', or petitioners' counsel's, failure to exercise due care, or lack of knowledge of, or failure to properly apply, the patent statutes or rules of practice are not, in any event, extraordinary circumstances where the interests of justice require the granting of relief. See, *In re Tetrafluor, Inc.,* 17 USPQ2d 1160, 1162 (Comm'r Pats. 1990); *In re Bird and Son, Inc.,* 195 USPQ 586, 588 (Comm'r Pats. 1977). Accordingly, failure to know and properly apply the rules of practice before the USPTO is not a basis for seeking waiver of the rules under 1.183.

(Patent Office Dismissal of Petition, Doc. No. 11-7 at 96). We respectfully submit that Dickstein Shapiro's recourse to *Alice* should be rejected.

*Alice* is not the applicable law and the "ingenious" inventions that Dickstein Shapiro fought for and patented are not mere "abstract ideas." Britannica should be given a fair opportunity to conduct discovery and present expert testimony on this matter and to prove its case at trial. We respectfully urge reversal and remand of this cause for trial.

Respectfully submitted,


*/s/ Neil H. Koslowe*
*Attorneys For Appellant,*
Encyclopaedia Britannica, Inc.

41

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 9,645 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(e).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared using Microsoft Word 2010 in Times New Roman, a proportionally spaced typeface, and 14-point size font.

Dated: February 1, 2016          */s/ Neil H. Koslowe*
                                 *Attorney for Appellant*

**PROOF OF SERVICE**

The undersigned hereby certifies that on February 1, 2016 I caused the

foregoing:

**BRIEF OF APPELLANT ENCYCLOPAEDIA BRITANNICA**

to be electronically filed through the CM/ECF system, which will send a notice of

electronic filing to the counsel of record for Appellee, who are registered in the

CM/ECF system.


*/s/ Neil H. Koslowe*
*Attorney for Appellant*